UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

FIRST NIAGARA BANK, N.A.

        Plaintiff,

  v.              Civil Action No.: 13-00592(WJS) (JJM)

MORTGAGE BUILDER SOFTWARE, INC.

        Defendant.

---

# MEMORANDUM IN SUPPORT OF
# FIRST NIAGARA'S MOTION FOR SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for First Niagara Bank, N.A.*
Ryan K. Cummings and
Stephen W. Kelkenberg, of counsel
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: 716.856.4000
Email: *ryan_cummings@hodgsonruss.com*
Email: *skelkenb@hodgsonruss.com*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.........................................................................................................2

SUMMARY JUDGMENT STANDARD.......................................................................................8

ARGUMENT .................................................................................................................................9

POINT I.     MBSI BREACHED THE AGREEMENT...............................................................9

    A.     The Miser/Cohesion Interface.................................................................10

    B.     The Wolters Kluwer Interface ................................................................13

    C.     First Niagara Performed the Agreement .................................................14

    D.     First Niagara Has Been Damaged by MBSI's Breach............................14

POINT II.    MBSI'S ALLEGED DAMAGES ARE PRECLUDED
             BY THE PARTIES' CONTRACT .......................................................15

POINT III.   MBSI'S ALLEGED DAMAGES SHOULD BE DISMISSED
             BECAUSE THEY ARE SPECULATIVE.............................................21

POINT IV.    THE AGREEMENT RUNS FROM THE EFFECTIVE DATE ...........................23

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

PAGE

**FEDERAL CASES**

*Alleyne v. Four Seasons Hotel - N.Y.*,
    2001 U.S. Dist. LEXIS 1503 (S.D.N.Y. Feb. 12, 2001), *aff'd by*
    25 Fed. Appx. 74, 2002 U.S. App. LEXIS 1476 (2d Cir. 2002)........................................15, 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................8

*Deutsch v. Health Ins. Plan*, 573 F. Supp. 1433 (S.D.N.Y. 1983) ...............................................22

*Duse v. International Business Machines Corp.*, 252 F.3d 151 (2d Cir. 2001).........................8, 9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................8

*McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132 (E.D.N.Y. 2009).......................................9

*Niagara Mohawk Power Corp. v. Stone & Webster Eng. Corp.*,
    725 F. Supp. 656 (N.D.N.Y. 1989).......................................................................................16

*Roneker v. Kenworth Truck Company*, 977 F. Supp. 237 (W.D.N.Y. 1997) .........................18, 19

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) .....................................................................19

**STATE CASES**

*Bd. of Educ. of the Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley*,
    71 N.Y.2d 21 (1987) .............................................................................................................16

*Daily News, L.P. v. Rockwell Int'l Corp.*,
    256 A.D.2d 13, 680 N.Y.S.2d 510 (1st Dep't 1998) .............................................................15

*David Fox & Sons, Inc. v. King Poultry Co.*, 30 A.D.2d 789 (1st Dep't 1968)............................22

*Gartech Elec. Contr. Corp. v. Coastal Elec. Constr. Corp.*,
    66 A.D.3d 463, 887 N.Y.S.2d 24 (1st Dep't 2009) ...............................................................22

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430 (1994) ........................16, 17, 18

*Scott v. Palermo*, 233 A.D.2d 869, 649 N.Y.S.2d 289 (4th Dep't 1996) .....................................15

*Ware Bros. Co. v. Cortland Cart & Carriage Co.*, 192 N.Y. 439 (1908) ....................................22

*Wiener v. Lawrence-Picaso, Inc.*, 295 A.D.2d 273, 744 N.Y.S.2d 392 (1st Dep't 2002).............24

## TABLE OF AUTHORITIES - cont'd

PAGE

**RULES**

Rule 26 of the Federal Rules of Civil Procedure ....................................................................19, 23

Rule 56 of the Federal Rules of Civil Procedure ...........................................................................8

**OTHER AUTHORITIES**

PJI 4:20, Comment....................................................................................................................22

## PRELIMINARY STATEMENT

First Niagara Bank, N.A. ("First Niagara") and Mortgage Builder Software, Inc. ("MBSI") entered into a contract for MBSI to provide First Niagara with an end-to-end residential mortgage loan origination software program. From the outset, MBSI knew that its software program had to interface with First Niagara's mortgage servicing platform called MISER and a third-party document provider who would provide the actual forms that constitute a mortgage. The contract originally called for MBSI's software program to be implemented within 120 days of the contract execution. However, the parties mutually agreed to push the deadline back a number of times to accommodate their respective needs and limitations. In February 2012, with certain government imposed deadlines looming in order for First Niagara to proceed with its acquisition of almost 200 HSBC branches, First Niagara asked for a firm commitment from MBSI that certain critical pieces of the software would be implemented and working by February 20, 2012. MBSI did not meet the deadline. The individual at MBSI responsible for programming the interface between its software and the MISER system acknowledged that it was not fully functional by the deadline. He also acknowledged that the interface between MBSI's software and the third-party document vendor was not fully functional by the deadline. Simply put, First Niagara could not, and never did, originate a mortgage through the MBSI software as of the deadline.

As a result, First Niagara thereafter terminated the contract. First Niagara is entitled to summary judgment on its breach of contract claim against MBSI and dismissal of MBSI's counterclaim for same. In the alternative, and at the very least, First Niagara is entitled to summary judgment dismissing significant portions of MBSI's alleged damages because they

are barred by the Limitation of Liability and Damages clause in the contract; and are otherwise

speculative or calculated in a manner that is inconsistent with the plain language of the contract.

## FACTUAL BACKGROUND

### The First Niagara/MBSI Services Agreement

In 2010, First Niagara Bank began searching for a new mortgage loan origination

software provider.[1] After interviewing a number of potential providers, it eventually settled on

MBSI's mortgage builder software program.[2] First Niagara and MBSI entered into a Services

Agreement effective February 24, 2011 (the "Agreement").[3] The Term of the Agreement was for

36 months from the date of execution, or from February 24, 2011 to February 24, 2014.[4]

MBSI agreed to have the Services identified in the Agreement "Fully

Operational" within 120 days of the Effective Date of the Agreement.[5] "Services" was defined

as "the end-to-end mortgage loan origination services to be provided by Mortgage Builder

Services pursuant to the terms of this Agreement, including as set forth on Schedule I, as well as

---

[1]   Declaration of Ryan K. Cummings, dated March 6, 2015, Ex. F, p. 24, lines 9 – 20
      (hereinafter "Cummings Dec.").

[2]   Cummings Dec., Ex. F, p. 30, line 30 – p. 31, line 12.

[3]   Cummings Dec., Ex. Q.

[4]   Cummings Dec., Ex. Q, p. 3, ¶ 3 ("The term of this Agreement shall commence on the date
      hereof [February 24, 2011] and continue for the Minimum Use Period [defined as 36
      months].").

[5]   Cummings Dec., Ex. Q, p. 9, ¶ 11(B) ("Provided Customer reasonably cooperates in good
      faith, Mortgage Builder Services shall provide Customer with a written implementation plan
      which shall include an implementation date, which date shall be no more than 120 days after
      the Effective Date, in which the Services shall be Fully Operational."); p. 15, ¶ 1 ("Mortgage
      Builder Services shall provide Customer with a written implementation plan which shall
      include an implementation date, which date shall be no more than 120 days after the
      Effective Date, on which the Services shall be Fully Operational as described in Section 3
      above and Mortgage Builder Services shall implement and complete such implementation
      plan in accordance with its terms.").

Hosted Services."[6] "Fully Operational" was defined to mean "that all of the functionalities listed

in Schedule I are fully available and operational for use by Customer as described in the

Documentation, and the Services comply with the Minimum Service Requirements set forth in

Schedule I."[7] Schedule I to the Agreement identified, among other things, the following Services

that would be available for use by First Niagara:

> 2. **Origination/Loan Processing**: System allows for the completion of the 1003 Application, GFE and all upfront disclosures. Interfaces are available for ordering credit, submission to DU and/or Loan Prospector, order flood, Title and Appraisal requests. HVCC functionality exists to allow the system to auto assign the appraiser on the loan for compliance of HVCC regulations. In addition the system allows completion of all FHA and VA worksheets and addendums along with 203k documents. Generation of preapproval letters, final commitment letters, denial letters as well us tracking of upfront Order outs is available.
>
> \*    \*    \*
>
> 4. **Closing**: Preparation of closing documents for all loan types. Information in the closing screens is populated from other areas of the system so closers will not need to rekey data. Generation of Closing Instructions and calculation of the Draft/Wire breakdown. System can handle POA wording, Title only names and loans closed in the name of a trust.
>
> 5. **Forms Printing**: The system's library of forms contains all agency forms for Fannie Mae., Freddie Mac, FHA, VA and Rural Development as well as state specific disclosures for origination and closing of the loan. Emailing of forms and ability to establish print groups is also available. Interfaces to Doc Magic, IDS and MRG Document Technologies are also available.[8]

In addition to the foregoing Services that were to be Fully Operational by the

implementation date, Schedule I identifies MBSI's commitment to doing certain customization

work by the implementation date as well:

---

[6]   Cummings Dec., Ex. Q, p. 2.

[7]   Cummings Dec., Ex. Q, p. 2.

[8]   Cummings Dec., Ex. Q, p. 18.

3

Mortgage Builder Services agrees to have the following capabilities available, including testing, upon 90 days after the effective date of this agreement, pursuant to the respective responsibilities to be performed by the Customer and by any third party vendor systems the Customer has requested Mortgage Builder Services to interface with.

- Interface Mortgage Builder the required programs and system into the Customer's loan servicing system (MISER) utilizing Cohesion Middleware for loans to be-serviced by the customer
- Automate the accounting for the purpose of settlement and Customer's accounting system.9

In return for these Services, the parties agreed to a payment structure. Schedule I to the Agreement sets forth the Fees to be paid by First Niagara. Specifically, the Agreement calls for an $82,000 initial payment, which breaks down as follows: $40,000 deposit to be used against the first two months fees, $15,000 for MBSI's set up fee, $5,000 for a web production portal, and $22,000 for dedicated servers.[10] The Monthly Fixed Service fee was identified as $20,000.[11] The Agreement also provided that MBSI was to be paid $20 for each loan closed in excess of 500 loans per-month.[12] The Monthly Fixed Service fee and excess closed loan transaction fees were to "commence on the first day of the month after the first loan is closed and funded through the Mortgage Builder system."[13]

In the event that MBSI did not have the Services Fully Operational within 30 days of the implementation date, First Niagara was authorized to terminate the Agreement without any

---

[9]   Cummings Dec., Ex. Q, p. 14.

[10]   Cummings Dec., Ex. Q, p. 14.

[11]   Cummings Dec., Ex. Q, p. 14.

[12]   Cummings Dec., Ex. Q, p. 14.

[13]   Cummings Dec., Ex. Q, p. 14; *see also* Cummings Dec., Ex. Q, p. 3.

4

further obligation to MBSI: "[i]n the event that the Services are not Fully Operational within thirty (30) days after said implementation date, Customer shall have the right to terminate this Agreement immediately upon written notice to Mortgage Builder Services and without any further obligation to Mortgage Builder Services."[14] Finally, the Agreement included a non-waiver clause.[15]

**The Contract Performance**

Beginning in March 2011, MBSI began to gather information about the Cohesion/Miser interface.[16] In April 2011, First Niagara's core team visited MBSI's facilities in Michigan for some initial training.[17] At or about that time, First Niagara learned that MBSI did not have a contract with a document provider named DocMagic, so First Niagara began exploring another third-party document provider named Wolters Kluwer.[18] Throughout May, June, and July 2011, First Niagara and MBSI engaged in negotiations with Wolters Kluwer to be the third-party document provider.[19] In addition, as First Niagara's personnel became more familiar with the Mortgage Builder software program, they submitted a number of customization requests to MBSI. Most of the customization requests that First Niagara submitted to MBSI were necessitated by an MRA (Matter Requiring Action) issued by the Office of the Comptroller of the Currency ("OCC") to First Niagara and required for First Niagara to meet its regulatory

---

[14]   Cummings Dec., Ex. Q, p. 9.

[15]   Cummings Dec., Ex. Q, p. 12, ¶ 19.

[16]   Cummings Dec., Ex. C, p. 47, lines 16 – 18.

[17]   Cummings Dec., Ex. A, p. 52, lines 1 – 21.

[18]   Cummings Dec., Ex. B, p. 135, line 9 – p. 136, line 15; Ex. S.

[19]   Cummings Dec., Ex. B, p. 135, line 9 – p. 140, line 13.

requirements.[20] Due to the change in document vendors and the customization requests, the initial implementation date was pushed back from September 2011 to, ultimately, February 2012.[21]

Throughout the fall of 2011, MBSI and First Niagara continued to work with the document vendor, Wolters Kluwer, to develop the interface between Mortgage Builders' software and the Wolters Kluwer software to produce the documents First Niagara needed to originate its mortgage loans.[22] The parties also continued to do customization work and testing.[23]

First Niagara paid the initial deposit and every invoice MBSI issued to it for customization work, right up until it terminated the Agreement on March 6, 2012.[24]

**The OCC**

When First Niagara entered into an agreement with HSBC to acquire approximately 200 branches, the regulatory body charged with overseeing First Niagara's activities, the OCC, imposed certain requirements on First Niagara before the closing could occur. Specifically, with regard to implementation of the Mortgage Builder software, the OCC prohibited the branch transfer from taking place too close in time to the implementation of the software.[25] MBSI was aware of the OCC's prohibition by at least September 2011.[26]

---

[20]   Cummings Dec., Ex. E, p. 22, line 20 – p. 23, line 3; p. 95, line 12 – p. 96, line 16; p. 248, lines 3 – 6; p. 249, line 11 – p. 250, line 11; Ex. F, p. 98, lines 12 – 21.

[21]   Cummings Dec., Ex. F, p. 123, line 17 – p. 125, line 5.

[22]   Cummings Dec., Ex. F, p. 116, line 20 – p. 126, line 1.

[23]   Cummings Dec., Ex. E, p. 177, line 20 – p. 179, line 15.

[24]   Cummings Dec., Ex. O, pp. 31 – 32, Response 14.

[25]   Cummings Dec., Ex. A, p. 296, lines 4 – 15.

[26]   Cummings Dec., Ex. A, p. 296, lines 4 – 15; Ex. M, p. MBSI (FN) 000153.

**First Niagara's Line in the Sand Email**

Beginning in January 2012, First Niagara's management became concerned about the delayed implementation date for the Mortgage Builder software and its potential impact on the closing of the HSBC branch transaction.[27] Those concerns were conveyed to MBSI.[28] Accordingly, a February 27, 2012 implementation deadline was set.[29] In early February 2012, First Niagara became concerned about the progress of a number of aspects of the project, in particular the Cohesion/Miser interface and the Wolters Kluwer interface. On February 9, 2012, Tom Faughnan at First Niagara issued a firm commitment email to MBSI.[30] Essentially, Mr. Faughnan demanded that MBSI commit to having certain critical pieces of the project done by February 20, 2012, including the Cohesion interface and certain aspects of the Wolters Kluwer interface.[31] On February 21, 2012, MBSI wrote to First Niagara and stated that they believed they had completed the critical projects.[32]

However, on February 22, 2012, MBSI's project manager, Melissa Kozicki, wrote First Niagara and acknowledged that the loans going to Cohesion were experiencing a significant number of errors.[33] MBSI's senior programmer for both the Cohesion interface and the Wolters Kluwer interface acknowledged, under oath, that neither interface was fully functional by

---

[27]   Cummings Dec., Ex. A, p. 204, line 15 – p. 205, line 15; Ex. H.

[28]   *Id.*

[29]   Cummings Dec., Ex. A, p. 205, lines 9 – 15.

[30]   Cummings Dec., Ex. I.

[31]   *Id.*

[32]   Cummings Dec., Ex. J.

[33]   Cummings Dec., Ex. K.

February 22, 2012, or even March 6, 2012.[34] On March 6, 2012, First Niagara terminated the Agreement.[35]

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[36] Regarding materiality, the Supreme Court has held that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[37] More importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[38] Accordingly, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[39] When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."[40]

---

[34]   Cummings Dec., Ex. D, p. 54, lines 8 – 21; Ex. W, p. 1 – 2.

[35]   Cummings Dec., Ex. T.

[36]   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986).

[37]   *Anderson*, 477 U.S. at 248.

[38]   *Id.*

[39]   *Id.* at 249.

[40]   *Id*. at 250.

As the Second Circuit observed in *Duse v. International Business Machines Corp.*,[41] "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."[42] However, "[i]f the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment."[43]

## ARGUMENT

### POINT I.
### MBSI BREACHED THE AGREEMENT

MBSI breached the Agreement in two ways. First, it never had the Miser/Cohesion interface operational. And second, as of the termination date, MBSI did not have the interface with Wolters Kluwer completed. First Niagara paid in excess of $170,000 to MBSI for the software program and it was never able to originate a single mortgage through that program. First Niagara has been damaged as a result of MBSI's breaches.

In order to establish a breach of contract claim, the moving party must demonstrate: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."[44] There is no dispute that First Niagara and MBSI entered into the

---

[41]   252 F.3d 151, 158 (2d Cir. 2001).

[42]   *Id.* at 158 (citing e.g., *Anderson*, 477 U.S. at 255).

[43]   *Duse*, 252 F.3d at 158 (citations omitted).

[44]   *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 169-170 (E.D.N.Y. 2009) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted); accord *Singapore Recycle Centre Pte. Ltd. v. Kad Int'l Marketing, Inc.*, No. 06-CV-4997 (RRM), 2009 U.S. Dist. LEXIS 68635, 2009 WL 2424333, at *4 (E.D.N.Y. Aug. 6, 2009).

Agreement.[45] There is no dispute that, prior to terminating the Agreement, First Niagara paid

MBSI for its work pursuant to the Agreement.[46] According to the Agreement, MBSI promised to

have the following Services Fully Operational by the "Go Live" date in the Agreement:

- Origination/Loan Processing
- Closing
- Forms Printing
- Interface Mortgage Builder the required programs and system into the Customer's loan servicing system (MISER) utilizing Cohesion Middleware for loans to be serviced by the customer
- Automate the accounting for the purpose of settlement and Customer's accounting system[47]

These Services were not Fully Operational as of the implementation date set by First Niagara.

**A.    The Miser/Cohesion Interface**

Daniel Perttula was MBSI's senior developer for certain portions of the First

Niagara project.[48] MBSI's Head of Operations, Liz Fafette, assigned him two specific projects

for the First Niagara matter: (1) developing an interface between the Mortgage Builder software

and the third-party forms provider, Wolters Kluwer; and (2) developing an interface between the

Mortgage Builder software and First Niagara's MISER system.[49] As Mr. Perttula testified, when

he was assigned the MISER interface project he understood that First Niagara "wanted a

complete interface between Mortgage Builder and their [First Niagara's] core banking system

---

[45]   Cummings Dec., Ex. Q,

[46]   Cummings Dec., Ex. O, pp. 31 – 32, Response 14.

[47]   Cummings Dec., Ex. Q, pp. 14 – 18.

[48]   Cummings Dec., Ex. D, p. 11, lines 2 – 11.

[49]   Cummings Dec., Ex. D, p. 12, lines 5 – 10.

and the MISER – and the MISER system."[50] When asked to explain what a complete interface

meant, Mr. Perttula stated: "[t]hey wanted loan information to travel from Mortgage Builder into

their MISER core banking interface to save them from having to type it in themselves. They

wanted an automated, the data to automatically come from Mortgage Builder and go into their

MISER system."[51] In order to interface the Mortgage Builder software with First Niagara's

MISER system, MBSI had to interface with a middleware program called Cohesion.[52]

Essentially, the Mortgage Builder software would talk to the Cohesion middleware software,

which would then talk with the MISER system. MBSI was solely responsible for establishing the

MISER interface.[53]

        Prior to the First Niagara project, Mr. Perttula had never been responsible for

creating an interface between the Mortgage Builder software and a middleware program such as

Cohesion.[54] Mr. Perttula's boss, Ms. Fafette, commented to First Niagara on March 11, 2011 that

the MISER interface "appears to structure quite differently than any other interfaces we have

ever developed before."[55] Despite the fact that the MISER interface was a "large integration" by

MBSI's own estimation, MBSI never assigned another developer to work on the MISER

interface project with Mr. Perttula.[56] Mr. Perttula's boss testified that in order for the MISER

interface to be fully functional, data would have to be transmitted from the Mortgage Builder

---

[50]  Cummings Dec., Ex. D, p. 12, lines 17 – 22.

[51]  Cummings Dec., Ex. D, p. 12, line 23 – p. 13, line 4.

[52]  Cummings Dec., Ex. D, p. 13, line 19 – p. 14, line 15.

[53]  Cummings Dec., Ex. O, pp. 10 – 11, Response 4.

[54]  Cummings Dec., Ex. D, p. 14, line 24 – p. 15, line 2.

[55]  Cummings Dec., Ex. C, p. 49, lines 20 – 25; Ex. U.

[56]  Cummings Dec., Ex. D, p. 27, lines 8 – 15; p. 43, line 22 – p. 44, line 11; Ex. V.

software to MISER, and the data would have to be transmitted accurately (she used the term validated)—i.e. such that the right data ended up in the right box in MISER.[57]

MBSI's point person for the First Niagara project, Melissa Kozicki, admitted that as of February 22, 2012 a significant number of loans being transmitted from the Mortgage Builder software to Miser were experiencing errors: "it is certainly true that the a [*sic*] large percentage of loans are receiving errors."[58] This is two days after the firm commitment deadline set by First Niagara and the day after MBSI had represented to First Niagara that Cohesion was in working order. In fact, Ms. Kozicki testified that Cohesion was not in working order as of February 22, 2012: "Q. So as of February 22, 2012, the fact that the cohesion interface had been installed might still have been true, but it actually was not in working order at that point? A. I would be willing to say that is true…."[59] According to Mr. Perttula, First Niagara was testing the MISER interface and reporting errors right up to the date the Agreement was terminated on March 6, 2012.[60] This is confirmed by the Defect Log Melissa Kozicki sent to First Niagara on the very day First Niagara terminated the Agreement.[61] That document shows 302 outstanding defects on the First Niagara project as of March 6, 2012, and of those, 11 related to the Miser interface and identified MBSI as the responsible party.[62] Simply put, as of the date First Niagara terminated the Agreement—which was more than one year after the parties executed the Agreement—MBSI still had not completed the contractually required interface between its

---

[57]   Cummings Dec., Ex. C, p. 99, line 22 – p. 101, line 12; Ex. N

[58]   Cummings Dec., Ex. K

[59]   Cummings Dec., Ex. A, p. 270, lines 6 – 10; Ex. K.

[60]   Cummings Dec., Ex. D, p. 54, lines 8 – 13; Ex. W, p. 1 – 2.

[61]   Cummings Dec., Ex. T; Ex. L, pps. 2 – 11 Bates Labeled FN0237211.

[62]   Cummings Dec., Ex L, pps. 2 – 11 Bates Labeled FN0237211.

software and First Niagara's MISER system. MBSI breached a material term of the Agreement

because the interface between Mortgage Builder's software and First Niagara's MISER system

was never completed.

**B.      The Wolters Kluwer Interface**

The Wolters Kluwer interface was similar to the Cohesion/MISER interface. The

goal was to pass loan information from the Mortgage Builder software to Wolters Kluwer for

generation of loan documents which First Niagara could then print.[63] Prior to the First Niagara

project, Mr. Perttula had never developed an interface with a document preparation vendor such

as Wolters Kluwer.[64] Despite the size of the Wolters Kluwer interface, and Mr. Perttula's

responsibilities for the MISER interface, MBSI never assigned another developer to help Mr.

Perttula with the Wolters Kluwer interface.[65] And, like the MISER interface, First Niagara

continued to test the Wolters Kluwer interface and report errors right until the date the

Agreement was terminated.[66] Again, according to MBSI's own Defect Log on March 6, 2012,

there were 10 defects identified relating to the Wolters Kluwer interface for which MBSI was the

responsible party.[67] MBSI breached the Agreement by failing to complete the interface that was

necessary for First Niagara to produce documents for its mortgage loans such as origination/loan

processing documents, closing documents, and governmental forms.

---

[63]   Cummings Dec., Ex. D, p. 15, lines 3 – 12.

[64]   Cummings Dec., Ex. D, p. 15, lines 13 – 15.

[65]   Cummings Dec., Ex. D, p. 27, lines 19 – 21.

[66]   Cummings Dec., Ex. D, p. 54, lines 14 – 21.

[67]   Cummings Dec., Ex. L, pps. 2 – 11 Bates Labeled FN0237211.

**C.      First Niagara Performed the Agreement**

MBSI has admitted that First Niagara performed its part of the Agreement by making the required payments up until the Agreement was terminated. Specifically, MBSI has admitted that First Niagara made a payment of $20,000 on February 7, 2011, an $82,000 payment on February 24, 2011, a $12,750 payment on October 1, 2011, an $8,200 payment on December 1, 2011, a $14,700 payment on January 1, 2012, a $6,900 payment on February 1, 2012, and a $27,750 payment on March 1, 2012.[68] The only invoice from MBSI that was not paid by First Niagara was issued after the Agreement was terminated on March 6, 2012.

**D.      First Niagara Has Been Damaged by MBSI's Breach**

As discussed above, First Niagara paid MBSI $172,300 to implement an end-to-end mortgage loan origination software program. MBSI had over a year to implement the software program, but it failed to do so. There is no dispute that First Niagara never funded a single mortgage through the Mortgage Builder software.[69] As a result, First Niagara has been damaged in the amount of $172,300 because of MBSI's breach. First Niagara is entitled to summary judgment on its breach of contract claim against MBSI in the amount of $172,300, plus statutory interest at the rate of 9% from the date of payment. In addition, First Niagara is entitled to dismissal of MBSI's breach of contract claim based on First Niagara's termination of the Agreement due to MBSI's breaches.

---

[68]   Cummings Dec., Ex. O, pp. 31 – 32, Response 14.

[69]   Cummings Dec., Ex. B, p. 65, lines 20 – 22.

# POINT II.
## MBSI'S ALLEGED DAMAGES ARE PRECLUDED BY THE PARTIES' CONTRACT

Even if MBSI had not breached the Agreement—which it did—the Court should still dismiss most of MBSI's claimed damages because they are expressly precluded by the Limitation of Liability and Damages clause in the Agreement. The clause expressly waives either parties' entitlement to indirect, special, consequential, or incidental damages. The vast majority of the damages MBSI has identified in its discovery responses are indirect, special, consequential or incidental. Accordingly, at the very least, First Niagara is entitled to summary judgment dismissing those damages claims as a matter of law.

The Agreement has the following Limitation of Liability and Damages clause:

> 13.   LIMITATION OF LIABILITY AND DAMAGES. EXCEPT AS TO CLAIMS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTY CLAIMS, EXPRESS OR IMPLIED, AND/OR CLAIMS SUBJECT TO THE INDEMNIFICATION PROVISIONS, NEITHER PARTY SHALL HAVE LIABILITY TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, WHETHER BASED ON CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHER TORT, INDEMNITY OR CONTRIBUTION, OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.[70]

Such clauses are routinely enforced in New York.[71]

---

[70]   Cummings Dec., Ex. Q, p. 10, ¶ 13.

[71]   *See e.g. Daily News, L.P. v. Rockwell Int'l Corp.*, 256 A.D.2d 13, 13-14, 680 N.Y.S.2d 510, 510 (1st Dep't 1998) ("Plaintiff's breach of contract claim seeking consequential damages was properly dismissed since the parties' contract, which we deem to be enforceable in relevant part since there has been no showing of unconscionability, limits the remedies available thereunder and expressly excludes as a remedy the recovery of consequential damages.") (citing *Mom's Bagels v. Sig Greenbaum Inc.*, 164 A.D.2d 820, 822, 559 N.Y.S.2d 883, 884 (1st Dep't 1990), *appeal dismissed*, 77 N.Y.2d 902 (1991)); *Scott v.*

Under New York law, "a party in a contract action is generally confined to the remedies found in the contract."[72] The New York Court of Appeals has held that "[p]arties to a contract have the power to specifically delineate the scope of their liability at the time the contract is formed. Thus, there is nothing unfair in defining a contracting party's liability by the scope of its promise as reflected by the agreement of the parties. Indeed, this is required by the very nature of contract law, where potential liability is determined in advance by the parties."[73] "An unambiguous contractual provision that limits the liability of a party for the breach of a contract is enforceable unless a special relationship between the parties, a statute, or public policy imposes liability."[74] In general, "whether the breaching party deliberately rather than inadvertently failed to perform contractual obligations" does not affect provisions limiting the measure of damages for breach of contract unless stated in the contract.[75]

---

*Palermo*, 233 A.D.2d 869, 649 N.Y.S.2d 289 (4th Dep't 1996) (enforcing contractual provision limiting consequential damages).

[72]   *Alleyne v. Four Seasons Hotel - N.Y.*, 2001 U.S. Dist. LEXIS 1503, 51-54 (S.D.N.Y. Feb. 12, 2001), *aff'd by* 25 Fed. Appx. 74, 2002 U.S. App. LEXIS 1476 (2d Cir. 2001) (quoting *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012, 1016 (E.D.N.Y. 1996), *aff'd*, 125 F.3d 845 (2d. Cir. 1997)); *Niagara Mohawk Power Corp. v. Stone & Webster Eng. Corp.*, 725 F. Supp. 656, 664 (N.D.N.Y. 1989).

[73]   *Bd. of Educ. of the Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21 (1987).

[74]   *Alleyne*, 2001 U.S. Dist. LEXIS at 52-53 (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430 (N.Y. 1994) (upholding provision limiting the defendant's liability for consequential damages); *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 270 A.D.2d 325, 704 N.Y.S.2d 289, 290 (2d Dep't 2000) (upholding provision limiting damages to fee paid for services); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 730 (1st Dep't 1995) (upholding unambiguous provision limiting damages to fee paid for services); *Rivkin v. Brackman*, 167 A.D.2d 239, 561 N.Y.S.2d 738, 740 (1st Dep't 1990); *Songer v. Mack Trucks, Inc.*, 23 A.D.2d 544, 256 N.Y.S.2d 313, 315 (1st Dep't 1965) (limiting plaintiff to remedies provided for in employment contract where plaintiff was involuntarily terminated).

[75]   *Noble Lowndes*, 84 N.Y.2d at 435.

In *Metropolitan Life Insurance Company v. Noble Lowndes International, Inc.*,[76] the New York Court of Appeals addressed a case very similar to the one between First Niagara and MBSI. MetLife hired Noble to develop a computer software program to process claims submitted to MetLife.[77] The contract called for MetLife to pay $160,000 for the base system software and up to $390,000 in customized enhancements that MetLife requested.[78] MetLife paid $44,0000 for the customizations it ultimately requested.[79] Accordingly, MetLife paid $204,000 to Noble.[80] The dispute arose when MetLife rejected two enhancements to the system offered by Noble.[81] In response, Noble demanded an upward adjustment of the $390,000 customization cap or it would withdraw from the project.[82] MetLife rejected the demand and Noble stopped work.[83]

MetLife commenced a lawsuit seeking the return of the $204,000 it paid to Noble, plus cover damages (replacement software provider) and lost savings.[84] Noble asserted that MetLife's damages were limited to its direct or actual damages based on the contractual limitation of liability provision in their contract, which stated that neither party shall be liable to the other "for any lost profits, lost savings or other consequential damages, even if [they have] been advised of the possibility of or could have foreseen such damages."[85] The trial court

---

[76]   84 N.Y.2d 430 (1994).

[77]   *Id.* at 433.

[78]   *Id.*

[79]   *Id.*

[80]   *Id.*

[81]   *Id.*

[82]   *Noble Lowndes*, 84 N.Y.2d at 433.

[83]   *Id.*

[84]   *Id.*

[85]   *Id.*

allowed MetLife to present its consequential damages to a jury and it was awarded $3.9 million in total damages, including $581,000 for cover damages and $2.8 million in lost savings.[86] On appeal, the Appellate Division modified the verdict on the law and reduced MetLife's damages to the $204,000 MetLife paid Noble—its actual damages.[87] The Court of Appeals affirmed the Appellate Division's decision. The Court held that contractual limitations of liability provisions should be enforced: "A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor."[88] Applying this principal, the Court found that MetLife's damages were limited to the $204,000 it paid Noble.

The damages MBSI has claimed are virtually all indirect, special, consequential, or incidental damages and, therefore, are expressly barred by the limitation of liability clause in the Agreement. In *Roneker v. Kenworth Truck Company*,[89] this Court discussed the difference between direct damages and consequential damages. The Court held that "[i]n essence, consequential damages are economic losses, such as lost profits."[90] "Put another way, 'consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by

---

[86] *Id.* at 434.

[87] *Id.*

[88] *Id.* at 436.

[89] 977 F. Supp. 237 (W.D.N.Y. 1997).

[90] *Id.* at 240 (citations omitted).

the breaching party at the time of contracting.'"[91] The *Roneker* Court then went on to hold that the plaintiff's lost income and lost future earnings damages were consequential damages and, therefore, were barred by the limitation of damages provision in the parties agreement.[92]

In its Rule 26 disclosures, MBSI identified the following claimed damages:

1.     $20,000 per-month for 3 years = $720,000 (the "Monthly Fixed Service Fee");

2.     $20.00 for each loan over 500/month, based on an estimate of 2,000 loans/month = $1,440,000;

3.     Loss of vendor transaction fees at $61,274 per-month over 3 years = $2,205,864;

4.     Loss of revenue from Wolters Kluwer interface – 20% of the amount WK would have charged First Niagara for document preparation totaling $52,930 per-month for 36 months = $1,09,480 x 20% = $381,096; and

5.     Amount of unpaid and/or unbilled invoices based on expectation of continuing relationship = $352,300.

Total identified by MBSI: $5,099,260.[93]

The only damages MBSI has identified that would potentially constitute direct damages are the Monthly Fixed Service fees (category 1), excess loan volumes (category 2), and the costs it incurred for customization work it performed, but was not paid for, prior to termination (approximately $30,000 in category 5). As MBSI admitted in its interrogatory responses, it was paid $20,000 on February 7, 2011; $82,000 on February 24, 2011; $12,750 on October 1, 2011; $8,200 on December 1, 2011; $14,700 on January 1, 2012; $6,900 on February

---

[91]     *Id.* (quoting *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y. 1974)).

[92]     *Id.* at 241; *see also Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000) (holding that lost operating profits and plaintiff's loss of an asset that was in its possession prior to the defendant's breach are consequential damages).

[93]     Cummings Dec., Ex. P, pp. 4-5.

1, 2012; and $27,750 on March 1, 2012.[94] As is evident, First Niagara was paying for the customization requests as they were billed by MBSI. First Niagara understands that MBSI claims it performed customization work worth $36,450 for which it invoiced but has not been paid.

However, the lost vendor transaction fees, lost revenue from Wolters Kluwer, and the unbilled invoices (categories 3, 4, and 5), are all indirect, special, consequential, or incidental damages. Accordingly, those categories of damages should be dismissed as a matter of law. MBSI's owner, Kevin Smith, admitted that the vendor transaction fees would not be paid by First Niagara, rather they would be paid by the third-party vendors directly to MBSI.[95] Similarly, the Wolters Kluwer fees would be paid directly by Wolters Kluwer to MBSI.[96] There is no reference in the Agreement between First Niagara and MBSI to third-party vendor fees or Wolters Kluwer fees that MBSI was allegedly going to receive.[97] These alleged damages are quintessentially indirect, special, consequential, or incidental damages and, as such, are expressly barred by the Agreement.

With regard to the "unbilled invoices based on an expectation of continuing relationship" damages (category 5), MBSI admitted that it never sent an invoice to First Niagara for this alleged work and it had no intention of charging First Niagara for that alleged work if there was an ongoing relationship. MBSI's owner specifically testified as such:

> Q. Well, you just said it was an all-encompassing bill. You didn't actually send an invoice to First Niagara for the unbilled time, did you?

---

[94]   Cummings Dec., Ex. O, pp. 31-32, Response 14.

[95]   Cummings Dec., Ex. B, p. 255, lines 14 – 16.

[96]   Cummings Dec., Ex. G, p. 43, lines 11 – 16.

[97]   Cummings Dec., Ex. Q.

A.   Correct.

Q.   And if there was a continuing relationship between First Niagara and MBSI, MBSI would not have billed First Niagara for those unbilled costs, right?

A. Correct.[98]

MBSI's 30(b)(6) witness on its damages also testified that it never would have charged First Niagara for the category five damages if it had remained a customer.[99] Simply put, the fifth category of damages are not calculated based on anything in the Agreement, with the potential exception of the final invoice MBSI issued after First Niagara terminated the Agreement in the amount of $36,450, and, as such constitute indirect, special, consequential, or incidental damages that are barred by the Agreement. MBSI's third, fourth, and fifth categories of damages should be dismissed.

## POINT III.
## MBSI'S ALLEGED DAMAGES SHOULD BE
## DISMISSED BECAUSE THEY ARE SPECULATIVE

MBSI did no calculation to determine what its costs would have been to perform the Agreement and earn the fees to which it claims entitlement. First Niagara has attempted throughout discovery to discern what it would have cost MBSI to perform the Agreement, but MBSI has simply failed to provide any calculation or documentation from which a calculation of its avoided costs can be determined. Because of this failure, MBSI's alleged damages are overstated, speculative and subject to dismissal.

---

[98]   Cummings Dec., Ex. B, p. 265, lines 2 – 9.

[99]   Cummings Dec., Ex. G, p. 37, lines 7 – 13.

In cases such as this, the non-breaching party's damages are "the difference between the contract price, being the amount which he or she would have earned and been entitled to recover on performance, and the amount which it would have cost the plaintiff to perform under the contract."[100] As the New York Pattern Jury Instructions for breach of contract damages states: "[t]he basic principle of damages in a contract action is to leave the injured party in as good a position as he or she would have been if the contract had been fully performed. It is equally fundamental that the injured party should not recover more from the breach than the party would have gained had the contract been fully performed."[101] The party seeking damages has the burden of proof on establishing both the gross amount of damages, and the amount that should be deducted; the defendant must simply show that a deduction is warranted.[102]

---

[100]  NEW YORK JUR. 2d, § 35.

[101]  PJI 4:20, Comment, General Rules; *see also Ware Bros. Co. v. Cortland Cart & Carriage Co.*, 192 N.Y. 439, 443 (1908) ("[I]n a breach of an ordinary contract for the manufacture of an article or the supplying of goods or merchandise, including that which is known as ordinary job printing, the damage is the difference between the contract price and the cost of the goods, merchandise or manufactured article, in which the burden of showing the damages rests on the plaintiff."); *Deutsch v. Health Ins. Plan*, 573 F. Supp. 1433, 1443 (S.D.N.Y. 1983) ("This is not to say, of course, that Dr. Deutsch can recover the full contract price of $32.00 for every audiology patient of the East Nassau Medical Group. His award of contractual damages must still be reduced by the cost of performing the contract.").

[102]  *Ware Bros. Co.*, 192 N.Y. at 443; *see also See Gartech Elec. Contr. Corp. v. Coastal Elec. Constr. Corp.*, 66 A.D.3d 463, 887 N.Y.S.2d 24 (1st Dep't 2009) (holding that in the construction context, when a plaintiff sues for breach of contract for work that was done but not paid for, their damages are typically calculated by determining their actual costs to perform the work (labor and materials), plus a percentage for general overhead and profit); *David Fox & Sons, Inc. v. King Poultry Co.*, 30 A.D.2d 789, 790 (1st Dep't 1968) (dissent held that "[a]nother method of achieving the proper result would be to add the diverted sales to the plaintiffs' sales and allocate to the total the plaintiffs' overhead plus increased expenses of $ 1,800"), *adopted on appeal by majority in*, 23 N.Y.2d 914, 916 (1969) ("Order modified, without costs, by directing that judgment be entered after damages have been computed in accordance with the rule laid down in the dissenting opinion at the Appellate Division and, as so modified, affirmed.").

First Niagara has requested by way of interrogatories, document demands, and a 30(b)(6) deposition, information regarding the costs MBSI would have incurred to perform the contract for that 23 month period.[103] MBSI has simply failed to provide any information that would enable that calculation to be performed and its damages calculations fail to take into consideration any such costs. MBSI has not identified an expert to opine on its damages claim, which may have rectified this deficiency. As such, MBSI's purported damages claims should be dismissed in their entirety as a matter of law because they are speculative.

## POINT IV.
## THE AGREEMENT RUNS FROM THE EFFECTIVE DATE

Even with regard to its direct damages calculation (categories 1 and 2), some of MBSI's damages must be dismissed as a matter of simple contract interpretation. MBSI calculates each of its category of damages for 36 months from the date of First Niagara's purported breach.[104] That is simply wrong under the Agreement. The Effective Date, as defined by the Agreement, is February 24, 2011.[105] The "Term" of the Agreement is defined as commencing "on the date hereof and continue [*sic*] for the Minimum Use Period [36 months]."[106] "Fees" is defined as the basic monthly fees for Services . . . as set forth on Schedule 1."[107] The Monthly Fixed Service Fee is $20,000 per-month according to Schedule I.[108] Schedule I provides that the Fees start the month after the Services become Fully Operational: "Monthly

---

[103]   Cummings Dec., Exs. G, O, X, Y.

[104]   Cummings Dec., Ex. P, pp. 4 – 5.

[105]   Cummings Dex., Ex. Q, p. 1.

[106]   Cummings Dec., Ex. Q, p. 3, ¶ 3.

[107]   Cummings Dec., Ex. Q, p. 2.

[108]   Cummings Dec., Ex. Q, p. 14.

fixed and closed loan transaction fees will commence on the first day of the month ***after the first loan is closed and funded through the Mortgage Builder system.***"[109]

The Agreement was terminated on March 6, 2012.[110] The MBSI system was not Fully Operational and no loans had been closed and funded using the system as of that date.[111] Accordingly, at best, MBSI would have been able to start collecting fees in April 2012. That would have left 23 months on the Agreement—not the 36 months MBSI has used for its calculations.[112] As a matter of law, all of MBSI's alleged damages must be calculated using a 23 month period, not the 36 month period it utilized.

With regard to the Monthly Fixed Service fee, that means—at most—they total $460,000. However, even that amount must be reduced further because First Niagara pre-paid for the first two month's fees.[113] First Niagara is entitled to summary judgment dismissing MBSI's Monthly Fixed Service fee damages (category 1) to the extent they exceed $420,000.

With regard to the monthly excess loan volume, MBSI makes two mistakes. First, it calculates the loan volume for 36 months rather than the remaining 23 months. Second, it uses a completely unsupported assumption that First Niagara would have closed 2,000 each month. First Niagara's actual loan volume for each of the remaining 23 months is as follows:[114]

---

[109]   Cummings Dec., Ex. Q, p. 14 (emphasis supplied).

[110]   Cummings Dec., Ex. T.

[111]   Cummings Dec., Ex. B, p. 65, lines 20 – 22.

[112]   In a breach of contract case, the non-breaching party cannot recover damages beyond the initial term of the contract, even if there is a renewal clause in the contract. *See Wiener v. Lawrence-Picaso, Inc*., 295 A.D.2d 273, 744 N.Y.S.2d 392 (1st Dep't 2002).

[113]   Cummings Dec., Ex. Q, p. 14; Ex O, pp. 31 – 32, Response 14.

[114]   Declaration of Ryan Koczaja, ¶ 4, dated March 6, 2015.

| 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|
| April | 911 | January | 855 | January | 290 |
| May | 896 | February | 871 | February | 398 |
| June | 823 | March | 1074 | | |
| July | 802 | April | 945 | | |
| August | 920 | May | 995 | | |
| September | 820 | June | 1068 | | |
| October | 1060 | July | 989 | | |
| November | 993 | August | 836 | | |
| December | 1074 | September | 622 | | |
| | | October | 598 | | |
| | | November | 442 | | |
| | | December | 488 | | |

So, in 2012, there were 3,799 loans that were closed that were in excess of 500 per-month, in any given month. This would result in $75,980 in additional fees for 2012. In 2013, there were 3,853 loans that were closed in excess of 500 per-month, in any given month. This would result in $77,060 in additional fees for 2013. And in 2014, there were no loans that were closed in excess of 500 in any given month, so there would be no additional fees. In total, First Niagara closed 7,652 loans in excess of 500 in any given month, with a total for the additional fees of $153,040. First Niagara is entitled to summary judgment dismissing MBSI's excess loan volume claims (category 2) to the extent they exceed $153,040.

## **CONCLUSION**

For the foregoing reasons, First Niagara's motion for summary judgment on its breach of contract claim against MBSI should be granted.

25

Dated:          March 6, 2015

**HODGSON RUSS LLP**
*Attorneys for First Niagara Bank, N.A.*

By: /S/ Ryan K. Cummings _____
          Ryan K. Cummings
          Stephen W. Kelkenberg
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: 716.856.4000
Email: *ryan_cummings@hodgsonruss.com*
Email: *skelkenb@hodgsonruss.com*

26