UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FIRST NIAGARA BANK N.A.,

                                        Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                                          13-CV-592S

MORTGAGE BUILDER SOFTWARE, INC.,

                                        Defendant.


## I. INTRODUCTION

        Plaintiff First Niagara Bank N.A. ("First Niagara") initially commenced this breach-of-contract action against Mortgage Builder Software, Inc. ("MBSI") in New York State Supreme Court, Erie County.  MBSI properly removed the matter to this Court on June 6, 2013, on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  First Niagara filed an amended complaint on July 3, 2013, and MBSI filed an answer and counter-claim on July 19, 2013.  (Docket Nos. 12, 14.)  Currently pending before this Court are the parties' cross-motions for summary judgment.  (Docket Nos. 37, 38.)  For the following reasons, both motions are granted in part and denied in part.

## II. BACKGROUND[1]

Execution of the Service Agreement

        On February 24, 2011, First Niagara and MBSI entered into a Service Agreement whereby MBSI agreed to provide a software program, which MBSI calls "software as a service," implementing a new mortgage origination system at First Niagara.  (Docket No. 45-2 (MBSI's Rule 56.1 Statement of Undisputed Material Facts ("MBSI's

---

[1] Facts are undisputed unless otherwise noted.

Statement") at ¶ 1).)[2]  MBSI agreed to provide software that would ensure "end-to-end mortgage loan origination services," as well as hosting services, for First Niagara's mortgage lending business.  (Docket No. 37-2 (First Niagara's Rule 56.1 Statement of Undisputed Material Facts ("First Niagara's Statement") at ¶ 6).)  Specifically, MBSI agreed to provide certain "Services," as defined in the Service Agreement, including the development of two software interfaces:  an interface between MBSI's software and First Niagara's "loan servicing system (MISER) utilizing Cohesion Middleware," and an interface with a third-party document provider to allow for the printing of pre-filled forms. (Docket No. 12 (Am. Compl. Exh. A (the "Service Agreement") at 14).)  In exchange for MBSI's performance, First Niagara agreed to make an $82,000 initial payment and, once the Services were operational, a monthly fixed payment of $20,000, plus $20 for each loan closed in excess of 500 per month.  (Service Agreement at 14.)  In addition to making payments, First Niagara had certain "collaborative" duties as part of the implementation, including testing the software.  (See Docket No. 50-2, MBSI's Counter Statement of Material Facts ("MBSI's Counter Statement") at ¶ 42; MBSI's Statement at ¶ 72.)

The Service Agreement states, and the parties do not dispute, that the contract is governed by New York law.  (Service Agreement at ¶ 20.)  The Service Agreement also contains a waiver clause,[3] as well as a clause limiting liability and damages.[4]

---

[2] Certain filings in this matter, including MBSI's Statement, have been filed under seal in their entirety. This Court cites to those portions of the sealed filings as to which there is no basis for sealing.

[3] The waiver clause reads:  "One or more waivers by either party of a breach of any term, provision or condition hereof shall neither constitute nor be construed as a waiver by said party of any subsequent or continuing breach of such term, provision and/or condition.  The consent or approval of either party to or of any act by the other party requiring such consent and/or approval shall not be deemed a waiver, or render unnecessary consent to and/or approval of any subsequent and/or similar act."  (Service Agreement at ¶ 19.)

[4] The limitation of liability clause reads:  "LIMITATION OF LIABILITY AND DAMAGES.  EXCEPT AS TO

<u>Delays in Implementation</u>

The "kick-off meeting" for the project occurred on March 25, 2011, approximately six weeks after the Service Agreement was signed. (First Niagara's Counter Statement at ¶ 54.) By the time of that meeting, the implementation date for the project had been pushed back to July 2011. (MBSI's Statement at ¶ 63.) In May 2011, the implementation date was delayed again, and tentatively scheduled for October 2011. (MBSI's Statement at ¶ 73.) That date was delayed once more when, on November 3, 2011, First Niagara proposed a new implementation date of February 27, 2012. (MBSI's Statement at ¶ 118; <u>see also</u> First Niagara's Statement at ¶¶ 19-21.) Although both parties agreed to the delays, it appears that First Niagara set each of the dates. (<u>See</u> MBSI's Statement at ¶¶ 63, 73.)

First Niagara attributes the delays in implementation, in part, to time needed for negotiation with Wolters Kluwer, a third-party document provider engaged by First Niagara. (First Niagara's Statement at ¶ 21.) First Niagara chose Wolters Kluwer in May or June 2011 to provide the forms necessary for the new system (MBSI's Statement at ¶ 73), and both First Niagara and MBSI worked with Wolters Kluwer through the fall of 2011 to develop the necessary interface and to identify the documents that First Niagara needed to originate its mortgage loans. (First Niagara's Statement at ¶ 22.) First Niagara also contends that the project was delayed because MBSI had only one developer working on both the Cohesion and Wolters Kluwer

---

CLAIMS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTY CLAIMS, EXPRESS OR IMPLIED, AND/OR CLAIMS SUBJECT TO THE INDEMNIFICATION PROVISIONS, NEITHER PARTY SHALL HAVE LIABILITY TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, WHETHER BASED ON CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHER TORT, INDEMNITY OR CONTRIBUTION, OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES." (Service Agreement at ¶ 13 (capitalization in original).)

interfaces, despite their complexity.  (First Niagara's Statement at ¶¶ 37-46; 53-54.)

MBSI does not dispute that there was a single developer working on the two interfaces,

but notes that he was the "top developer" at the company and chosen for this project

based on his expertise.  (MBSI's Counter Statement at ¶¶ 45, 53-54.)

Both parties also point to customization requests from First Niagara as a reason

for delays.   Beginning shortly after the kick-off of the project and continuing into

February 2012, personnel at First Niagara sent numerous customization requests to

MBSI, seeking to meet the needs of the banks internal constituents and regulatory

requirements.  (MBSI's Statement at ¶¶ 79-93, 133; First Niagara's Counter Statement

at ¶ 79; First Niagara's Statement at ¶ 20.)   MBSI attributes the high volume of

customization requests to an "internal disagreement within First Niagara as to the scope

of the project."  (MBSI's Counter Statement at ¶ 20.)  It is undisputed that a number of

First Niagara personnel who later had a role in the implementation were not significantly

involved with the decision to use MBSI's software, nor did they participate in drafting the

terms of the Service Agreement.  (MBSI's Statement at ¶¶ 43-44.)  MBSI contends (and

First Niagara disputes) that from early on in the process, the expectations of these

individuals were inconsistent with the time and budgetary limitations of the project.

(MBSI's Statement at ¶ 47; Docket No. 56-2 (First Niagara's Counter Statement of

Material Facts ("First Niagara's Counter Statement") at ¶ 47).)  MBSI further contends

(and First Niagara disputes) that certain First Niagara personnel wanted a "Cadillac" or

a "Lexus" (as opposed to "out-of-the-box" or "generic" software) and that there was a

"disconnect between those who wanted functionality without regard to time and cost . . .

and those who were focused on having a system implemented within a specific time

frame and budget." (MBSI's Statement at ¶ 49; First Niagara's Counter Statement at ¶ 49.) First Niagara does not dispute that MBSI could not complete the project until the customizations were prioritized. (MBSI's Statement at ¶ 54; First Niagara's Counter Statement at ¶ 54.) However, the Service Agreement does expressly anticipate such customization requests, sets no deadline on them, and First Niagara pre-paid $20,000 for customizations. (First Niagara's Counter Statement at ¶¶ 154-156.)

As noted further below, MBSI also attributes the implementation delays to First Niagara's employees not being sufficiently engaged in the implementation process, and the diversion of First Niagara's resources to other projects. (MBSI's Statement at ¶¶ 6, 43-46, 47-49, 50-54; 74.) For instance, MBSI contends the initial kick-off meeting was delayed for six weeks after the execution of the Service Agreement due to First Niagara personnel being "redeployed" to work on other projects within the bank. (MBSI's Statement at ¶ 54.) First Niagara disputes this. (First Niagara's Counter Statement at ¶ 54.)

February 2012 Attempted Implementation

In September 2011, First Niagara informed MBSI that the Office of the Comptroller of the Currency (the "OCC"), First Niagara's regulatory authority, had prohibited it from closing on the purchase of approximately 200 HSBC branches at any point too close in time to the implementation of the MBSI software. (First Niagara's Statement at ¶¶ 25-26.) First Niagara contends that, in January 2012, its management became concerned that delays in the MBSI project might have an impact on the HSBC transaction. (First Niagara's Statement at ¶¶ 25-26.)

MBSI contends that these delays were, again, due to issues internal to First

Niagara, and the "scope creep" of the project.  (See MBSI's Statement at ¶¶ 127-28; MBSI's Counter Statement at ¶ 34.)  MBSI points to a January 13, 2012 email from the First Niagara project leader to the MBSI project leader stating that "everyone keeps putting things off and not focusing and it is really biting us in the butt now," and an internal email where the First Niagara project leader told a colleague that the First Niagara testers were "doing little more than going through the motions."  (MBSI's Statement at ¶¶ 127-28.)   First Niagara was still sending customization requests to MBSI through February 9, 2012.  (MBSI's Statement at ¶¶ 129, 133.)  In addition, the head of mortgage compliance at First Niagara, who was tasked with identifying the documents First Niagara needed from third-party document provider Wolters Kluwer (MBSI's Statement at ¶ 73; First Niagara's Counter Statement at ¶ 73), did not specify certain documents until December 2011, resulting in those documents not being available for MBSI to incorporate into the project until February 2012.  (MBSI's Statement at ¶ 132.)  First Niagara does not dispute these facts, but maintains that the delays were instead due to MBSI's failure to complete the interfaces on schedule.  (See First Niagara's Statement at ¶¶ 29-34.)

On February 9 or 10, 2012, First Niagara sent a letter to MBSI requiring that certain project milestones be met by February 20, 2012, including the Cohesion interface and the Wolters Kluwer interface.  (First Niagara's Statement at ¶¶ 30-31; MBSI's Statement at ¶ 8.)  On February 21, 2012, MBSI wrote to First Niagara and stated that it believed it had completed the critical projects as required by First Niagara. (First Niagara's Statement at ¶ 32.)  The next day, MBSI's project manager wrote First Niagara, stating that:  "it is certainly true that the a [sic] large percentage of loans are

receiving errors." (First Niagara's Statement at ¶ 47.)   MBSI continued testing the software and sending error reports to First Niagara until the termination of the Service Agreement.  (MBSI's Counter Statement at ¶ 34.)

Pointing to a February 28, 2012 email from Diane DiLaura, a system administrator in First Niagara's mortgage department, to Lisa Black, First Niagara's project manager, MBSI contends that First Niagara's employees knew that it would be impossible for MBSI to meet the February 2012 deadline.  (MBSI's Statement at ¶ 136.) First Niagara contends that MBSI mischaracterizes the email.  (First Niagara's Counter Statement at ¶ 136.)  The email, in which DiLaura responds to a question from Black regarding how much testing First Niagara has completed on the new loan origination software, reads:

> I would say [we are] 10% [finished with testing the new system] at best. We're constantly going back and forth with defects and retesting the same thing over and over just to set one loan to go through properly let alone trying to test all of the different loan program and scenarios. . . [MBSI] was obviously in a rush to deliver the product to us and aren't sending half the stuff they should be.  I thought it would be more of a dual effort when they were building [the interface between MBSI and Miser]. . . .  They just slammed it in so they could meet the deadline of [February 20, 2012] and figured they would take 30 days to cure all the effects assuming we are even able to identify all of the defects within that time frame.  They 100% knew they did not deliver a completed product because if they were testing the transactions they would have been receiving all of the same errors we are receiving.

(Docket No. 45-14, Exh. 64 to O'Brien Decl.; <u>see also</u> First Niagara's Counter Statement at ¶ 136.)  Several hours later, DiLaura followed up with Black in the same email thread, stating:

> I feel bad because I really like Melissa [Kozicki, MBSI's project manager] and Dan [Perttula, MBSI's developer on the project] - they have gone above and beyond and worked an enormous amount of overtime to attempt to get us something.  They were put in a very precarious position

7

and asked to do something that wasn't physically possible - at least not to do it right.  I'm sure they wouldn't typically deliver a product like that but the whole document piece was far above what their existing resources were capable of handling in the time frame allotted.  They couldn't have possibly anticipated the amount of coding/mapping necessary for the docs coupled with all of our custom requests.  They have really worked their butts off for us.  Really ashame [sic] it's probably going to end so badly.

(Docket No. 45-2, Exh. 64 to O'Brien Decl.; see also MBSI's Statement at ¶ 136.)

Termination of the Service Agreement

On March 6, 2012, First Niagara sent a letter to MBSI terminating the Service Agreement pursuant to Section 11(B) of the Service Agreement.  (First Niagara's Statement at ¶ 35; MBSI's Statement at ¶ 9.)  That section reads:

For Failure to Become Operational.  Provided [First Niagara] reasonably cooperates in good faith, [MBSI] shall provide [First Niagara] with a written implementation plan which shall include an implementation date, which date shall be no more than 120 days after the Effective Date, on which the Services shall be Fully Operational.  In the event that the Services are not Fully Operational within thirty (30) days after said implementation date, [First Niagara] shall have the right to terminate this Agreement immediately upon written notice to [MBSI] and without any further obligation to [MBSI].

(Service Agreement at ¶ 11(B).)

No loans were funded through the MBSI software.  (First Niagara's Statement at ¶ 35; MBSI's Statement at ¶ 9.)  First Niagara ultimately implemented an entirely different mortgage software system provided by FiServ, which it began considering as an alternative to MBSI's system no later than January 20, 2012.  (MBSI's Statement at ¶ 138.)

Damages

First Niagara contends that MBSI breached the Service Agreement by failing to complete the Miser/Cohesion interface and the Wolters-Kluwer interface.  First Niagara

further contends that it acted within its rights by terminating the Service Agreement pursuant to Section 11(B) and seeks $172,300 in damages, the full amount it paid to MBSI, plus statutory interest.  (See First Niagara's Statement at ¶ 36.)

MBSI disputes this, and has counter-claimed against First Niagara, alleging that First Niagara breached the Service Agreement by purporting to terminate when it had not acted in good faith.   MBSI seeks $5,099,260 in damages, divided into five categories:

1.   $20,000 per-month for 3 years = $720,000 (the "Monthly Fixed Service Fee");

2.   $20.00 for each loan over 500/month, based on an estimate of 2,000 loans/month = $1,440,000;

3.   Loss of vendor transaction fees at $61,274 per-month over 3 years = $2,205,864;

4.   Loss of revenue from Wolters Kluwer interface – 20% of the amount WK would have charged First Niagara for document preparation totaling $52,930 per-month for 36 months = [$1,905,480] x 20% = $381,096; and

5.   Amount of unpaid and/or unbilled invoices based on expectation of continuing relationship = $352,300.

(First Niagara's Statement at ¶ 59 (citing MBSI's Rule 26 Disclosures).)

### III. DISCUSSION

In its motion, First Niagara contends that it is entitled to summary judgment granting its claims and dismissing MBSI's counter-claim because:  (1) MBSI breached the Service Agreement; and (2) MBSI seeks damages to which it is not entitled under the Services Agreement.   MBSI has cross-moved for summary judgment, seeking dismissal of First Niagara's claims and a finding that First Niagara is liable for breach of contract.

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010).   A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor, 609 F.3d at 545 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)).   "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2003) cert. denied, 540 U.S. 811 (2003) (quoting Anderson, 477 U.S. at 248).   Where, as here, both parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, 249 F.3d 115, 121 (2d Cir. 2001).

**A.      Breach of Contract**

Under New York law, a party alleging a breach of contract must establish (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) resulting damages.  Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).  There is no dispute as to the first element (see First Niagara's Statement at ¶ 3; MBSI's Statement at ¶62), but each of the parties contends that it performed its duties under the Service Agreement while the other party breached.  First Niagara contends that MBSI breached the contract in at least two ways, and that First Niagara was therefore justified in terminating the Service Agreement under Section

10

11(B).   MBSI contends that First Niagara's termination was improper, and therefore constitutes a breach of contract.   First Niagara also disputes MBSI's claim to damages.

1.   Performance

The parties primarily disagree as to whether First Niagara properly terminated the Service Agreement (as argued by First Niagara), or improperly terminated and therefore breached the Service Agreement (as argued by MBSI).

It is well-settled that "'[u]nder New York law, . . . [w]here the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with.'" Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 727 (2d Cir. 1992) (quoting Consumers Power Co. v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201, 211 (W.D.N.Y. 1981)).   "New York courts . . . apply the clear New York rule requiring termination of a contract in accordance with its terms."   Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 519 (2d Cir. 1989); see also Blumberg v. Florence, 143 A.D.2d 380, 381 (2d Dep't 1988) ("Where the procedures for cancellation provided for by the contract specify conditions precedent to the right of termination, those procedures must be followed.").   An attempt to terminate a contract that fails to follow the contractually-mandated termination procedure is ineffective.   See New Image Constr., Inc. v. TDR Enters. Inc., 74 A.D.3d 680, 681 (1st Dep't 2010) (purported termination ineffective where terminating party failed to comply with contractual notice provisions).   First Niagara terminated the Service Agreement under Section 11(B), which allows First Niagara to terminate if the Services are not fully operational after a certain date[5] and if

---

[5] First Niagara makes note of the waiver provision in the Service Agreement (First Niagara's Statement at ¶ 1), but neither party briefs the issue of whether First Niagara waived its right to terminate under 11(B) and, if not, what was the applicable termination date pursuant to 11(B).   Because the question of good faith creates a threshold dispute as to a material fact, this Court need not address waiver at this time.

First Niagara has "reasonably cooperate[d] in good faith" on the implementation of the software.  (Service Agreement, Section 11(B).)   Accordingly, whether First Niagara "reasonably cooperate[d]" with MBSI "in good faith" is a material issue in the determination of whether either party breached the Service Agreement.

"'Under New York law, a covenant of good faith and fair dealing is implied in all contracts.'"  State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir. 2004) (quoting 1-10 Indus. Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631 (2d Dep't 2002)).  Although the duty here arises from an explicit good faith requirement in the Service Agreement, "because there is no contract provision defining 'good faith,' the term may be construed to have the same meaning it does in the implied covenant context."  See Barbara v. MarineMax, Inc., No. 12-CV-0368 ARR RER, 2013 WL 4507068, at *8 (E.D.N.Y. Aug. 22, 2013), aff'd, 577 F. App'x 49 (2d Cir. 2014) (Citing 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 31:1 (4th ed. 1993) ("[T]echnical terms and words of art are to be given their technical meaning when used in a transaction within their technical field, and by case law to the effect that when words or terms having a definite legal meaning and effect are knowingly used in a written contract, the parties will be presumed to have intended the words or terms to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the writing.")).  "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith."  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (alteration in original) (internal quotation marks omitted).  MBSI thus faces a substantial burden in

showing that First Niagara breached its duty to cooperate in good faith.[6]

The covenant of good faith may, as here, "require affirmative steps to cooperate in achieving the contract's objective." Id. (internal quotation marks omitted); see also Lowell v. Twin Disc, Inc., 527 F.2d 767, 770 (2d Cir. 1975) ("It is likewise implied in every contract that there is a duty of cooperation on the part of both parties."). MBSI contends, in essence, that First Niagara breached the Service Agreement by failing to provide the cooperation necessary for the implementation of the Service Agreement. See Lowell, 527 F.2d at 770 ("Thus, whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given."). The failures of cooperation alleged by MBSI include the change in scope of the project through numerous customization requests, the lack of engagement from First Niagara's employees, and an unreasonable timeline for completion that effectively ensured MBSI's failure. Although many of the facts that underlie these allegations are generally undisputed, whether those facts constitute bad faith on the part of First Niagara is in dispute.

"'In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties.'" Tractebel Energy Mktg., Inc., 487 F.3d at 98 (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)). "'Thus, whether particular conduct violates or is

---

[6] This burden will be particularly difficult as to intent. The evidence does not suggest that First Niagara had an intent to harm MBSI, but a reasonable fact finder could determine that First Niagara acted with reckless disregard of MBSI's rights to cooperation under the Service Agreement. See Paul v. Bank of Am. Corp., No. 09-CV-1932 (ENV)(JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011) ("the implied covenant of good faith will not be breached without some showing of intent to harm the other contracting party or a reckless disregard of it").

consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.'" Id.  The record in the present case is heavily fact-laden, with disputes arising over numerous individual pieces of evidence and their import, each contributing to this genuine issue of material fact.  Because First Niagara and MBSI each offer reasonable alternative and conflicting arguments as to whether termination was proper, neither party is entitled to summary judgment on its breach of contract claim, nor is either party entitled to summary judgment dismissing the claim against it.

2. Damages

First Niagara also challenges MBSI's damages, which MBSI has divided into five categories:  (1) Monthly Fixed Service Fee (as set forth in the Service Agreement); (2) the $20 per loan fee for loans over 500 each month (as set forth in the Service Agreement); (3) vendor transaction fees; (4) revenue from third-party document provider Wolters Kluwer; and (5) unpaid and/or unbilled invoices based on expectation of continuing relationship.   (First Niagara's Statement at ¶ 59 (citing MBSI's Rule 26 Disclosures).)

a. General vs. Consequential Damages

First Niagara challenges the category three and four damages as consequential, which it contends are not permitted under the Service Agreement.[7]  Under New York law, two types of damages may generally be pled in contract cases:  (1) general damages and (2) consequential damages.  "A plaintiff is seeking general damages

---

[7] First Niagara also challenges certain portions of the fifth category of damages that represent unbilled work for which MBSI has stated it would not have charged First Niagara had their relationship continued. (First Niagara's Statement at ¶ 63.)  First Niagara does not make a cogent argument as to how these constitute consequential damages, and this portion of First Niagara's motion is therefore denied.

when he tries to recover the value of the very performance promised." Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000) (internal quotation omitted). Consequential damages "seek to compensate a [non-breaching party] for additional losses (other than the value of the promised performance) that are incurred as a result of the [breaching party]'s breach." Id. at 175 (citation omitted). Under the Service Agreement, both parties explicitly waived certain categories of damages, including "indirect, special, punitive, consequential, or incidental damages." (Service Agreement at ¶ 13.) Such a provision is generally enforceable under New York law, provided it is not a contract of adhesion or otherwise in contravention of public policy. See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 436, 643 N.E.2d 504, 507 (N.Y. 1994)). Because MBSI makes no argument that the liability limitation is not enforceable, the question is whether the damages that MBSI seeks are permitted under the limited terms of the Service Agreement.

New York State's highest court has delineated the issue of what constitutes consequential damages as follows: "The distinction at the heart of these cases is whether the lost profits flowed directly from the contract itself or were, instead, the result of a separate agreement with a nonparty." Biotronik A.G. v. Conor Medsystems Ireland, Ltd., 22 N.Y.3d 799, 808, 11 N.E.3d 676, 681 (N.Y. 2014). The Second Circuit, applying New York law, has similarly stated:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost."

Tractebel Energy Mktg., Inc., 487 F.3d at 109.   Put another way, "'consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties . . .'"   Roneker v. Kenworth Truck Co., 977 F. Supp. 237, 240 (W.D.N.Y. 1997) (quoting Petroleo Brasileiro, S. A., Petrobras v. Ameropan Oil Corp., 372 F. Supp. 503, 508 (E.D.N.Y. 1974)); see also Carco Grp., Inc. v. Maconachy, 383 F. App'x 73, 75 (2d Cir. 2010) (consequential damages "result when the non-breaching party's ability to profit from related transactions is hindered by the breach").

The category three damages (vendor fees) and the category four damages (Wolters Kluwer revenue) both arise from third-party transactions.   If the Service Agreement had not been terminated, these fees would have been paid directly to MBSI by the vendors and by Wolters Kluwer, not by First Niagara.   (First Niagara's Statement at ¶ 60-61.)   The Service Agreement does acknowledge that third-party vendors may be necessary to performance of the contract.   (See Service Agreement at 14 ("[MBSI] agrees to have the following capabilities available . . . pursuant to the respective responsibilities to be performed by [First Niagara] and by any third party vendor systems [First Niagara] has requested [MBSI] to interface with.").)   However, neither the vendors nor Wolters Kluwer are party to the Service Agreement, nor are the fees to be paid by third parties specified by the Service Agreement or even referred to in it.

Although there is no bright-line rule stating that fees flowing from a third party cannot constitute general or compensatory damages, such cases are rare.   In Biotronik, the New York Court of Appeals held that, because the plaintiff had paid the defendant for a product at a price calculated as a percentage of the plaintiff's net sales of the

product, the plaintiff's lost profits resulting from the breach were general damages. Id. at 808-10, 988 N.Y.S.2d 527, 11 N.E.3d 676. Thus, the court held, lost profits were "clearly contemplated" under the parties' contract. Id. at 808, 988 N.Y.S.2d 527, 11 N.E.3d 676. But, unlike in Biotronik, the agreement here was not akin to a "joint venture," and there was no link between the payments First Niagara had agreed to pay and any third-party payments. Instead, First Niagara stood to benefit from its customers who originated loans, while MBSI would benefit from First Niagara (through the fees identified as damage categories one and two) and separately from third parties through collateral agreements.

The Service Agreement here is more akin to that in Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., where the plaintiff sought "to recover lost profits from lost sales to third-parties that [were] not governed" by the parties' contract. 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009). The court there held that the damages were "properly characterized as consequential damages, because, as a result of [the defendant]'s alleged breach, [plaintiff] suffered lost profits on collateral business arrangements." Id. See also In re Vivaro Corp., No. 12-13810, 2014 WL 486288 at *4 (Bankr. S.D.N.Y. Feb. 6, 2014) (characterizing as consequential damages plaintiff's "lost profits from unmade sales to third-parties in collateral transactions, none of which would have been governed by the contract between" the parties). In the category three and four damages, MBSI, like the plaintiffs in Compania Embotelladora and Vivaro Corp., is essentially seeking lost profits on collateral business arrangements.

Under these circumstances, the loss of profits from third parties is not a "natural and probable consequence" of the alleged breach of contract by First Niagara,

Biotronik, 22 N.Y.3d at 808, 988 N.Y.S.2d 527, but instead a form of consequential damages, because it is "one step removed from the naked performance promised by the defendant," Schonfeld, 218 F.3d at 177.  Because the Service Agreement precludes indirect and consequential damages, First Niagara is entitled to judgment as a matter of law on MBSI's claims for damages arising from loss of vendor transaction fees and loss of Wolters Kluwer revenue.  Accordingly, MBSI's category three and four damage claims are dismissed.

### b.  Avoided Costs

First Niagara further challenges MBSI's damage calculation, contending that because MBSI has failed to provide an exact amount of the costs it avoided due to the termination of the Service Agreement, MBSI's damages should be denied in their entirety as speculative.  It is true that damages "must be not merely speculative, possible, and imaginary," and instead "must be *reasonably certain* and such only as actually follow or may follow from the breach of the contract." Tractebel Energy Mktg., Inc., 487 F.3d at 110 (emphasis in original, internal quotation omitted).  But if MBSI is able to prove a breach of contract with certainty, "and the only uncertainty is as to [the amount of damages], there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach." Id. at 110 (internal quotation omitted).  While acknowledging the leeway given to parties proving damages in a breach of contract action, the Court also recognizes that "New York law does not countenance damage awards based on speculation or conjecture." Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir. 1991) (internal quotation and punctuation omitted).

In support of its argument, First Niagara points to <u>Projects Management Co. v. DynCorp International LLC</u>, 584 F. App'x 121, 123 (4th Cir. 2014), in which the Fourth Circuit affirmed the district court's dismissal because plaintiff had "failed to prove its damages to a reasonable certainty" and "[t]he only evidence that [plaintiff] produced regarding the amount of [damages] was a conclusory affidavit."  584 F. App'x 121, 123 (4th Cir. 2014).  That is not the case here.  Although First Niagara may not be satisfied with the amount of evidence MBSI has provided as to damages, that information is not so lacking as to require dismissal of all MBSI's damages, and therefore of MBSI's counter-claim.  MBSI has provided answers to interrogatories setting forth three areas of avoided costs including bandwidth and software licensing and fees.  (Docket No. 50-1, Exh. 4 to O'Brien Opp. Decl.)  One of MBSI's employees has also testified, during a 30(b)(6) deposition, that the exact amount of those fees is difficult to calculate because First Niagara terminated the Service Agreement before final decisions were made as to how the necessary software would be licensed.  (Docket No. 50-1, Exh. 3 to O'Brien Opp. Decl. at 61-63.)  Based on this evidence, a reasonable jury could find in MBSI's favor.

"When an issue of fact as to the existence of recoverable damages is raised, a [party seeking damages] must be given the opportunity to prove the amount of such damages at trial in accordance with the requirements of New York law . . . ."  <u>V.S. Int'l, S.A. v. Boyden World Corp.</u>, No. 90 CIV. 4091 (PKL), 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993).  Because a genuine dispute as to the amount of MBSI's damages exists, summary judgment on damages is inappropriate.

### c.  Incorrect Calculation of Damages

Finally, First Niagara argues that MBSI incorrectly calculated the category one and two damages based on the terms of the Service Agreement.  In accordance with the terms of the Service Agreement, certain fees, including the damages that MBSI claims in these categories, would not commence until "the first day of the month after the first loan is closed and funded through the Mortgage Builder system."  (Service Agreement at 14.)  Because no loans were closed and funded through the software prior to termination, First Niagara contends that the earliest date from which these damages could be assessed is March 2012, after the termination.  MBSI disputes this and argues that, had First Niagara cooperated in good faith, the software could have gone into use in September 2011.  This dispute, again, presents a genuine issue of material fact and cannot be resolved on a motion for summary judgment.

## B.    Declaratory Judgment

MBSI has also moved for dismissal of First Niagara's claim seeking a declaratory judgment.  The Declaratory Judgment Act ("DJA") provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear."  Dow Jones & Co., Inc. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).  "Declaratory relief is appropriate where an actual controversy exists and a declaration would serve a useful purpose in clarifying or settling the legal issues involved."  Am. Auto. Ins. Co. v. Advest, Inc., No. 08 CIV.

6488 (LAK), 2009 WL 3490060, at *1 (S.D.N.Y. Oct. 28, 2009) (internal quotation omitted).

"However, where a declaratory judgment claim is redundant of a primary claim raised by a party to a lawsuit, it is properly dismissed as duplicative," including "claims that simply mirror another party's claims." Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd., No. 11-CV-5802, 2014 WL 4175914, at *6 (E.D.N.Y. Aug. 20, 2014); see also Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 54, 529 N.Y.S.2d 279 (1st Dep't 1988) ("A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract."). Moreover, declaratory judgment is inappropriate where a party has already invoked its right to a coercive remedy. See Am. Auto. Ins. Co., 2009 WL 3490060, at *1 ("Where, however, the dispute may be resolved in a direct action for coercive relief, courts may dismiss the declaratory judgment complaint."). Accordingly, this Court dismisses First Niagara's declaratory-judgment claim because it is "unnecessary and inappropriate" in light of the fact that First Niagara has an adequate alternative remedy in its breach-of-contract claim.

## IV. CONCLUSION

For the foregoing reasons, First Niagara's motion for summary judgment is granted only as to the limitation of consequential damages. MBSI's motion for summary judgment is granted only as to the dismissal of First Niagara's claim for declaratory judgment.

**V. ORDERS**

IT HEREBY IS ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 37) is GRANTED as to the limitation of Defendant's damages and is otherwise DENIED;

FURTHER, that Defendant's Motion for Summary Judgment (Docket No. 38) is GRANTED as to the dismissal of Plaintiff's claim for declaratory judgment and is otherwise DENIED.

SO ORDERED.

Dated: May 22, 2016
Buffalo, New York

/s/William M. Skretny
 WILLIAM M. SKRETNY
United States District Judge